UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MEAGAN PILLIARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:13-CV-01582-RWS-SPM |
| | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff Meagan Pilliard for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). This matter was referred

to the undersigned United States Magistrate Judge for review and a recommended disposition

pursuant to 28 U.S.C. § 636(b). The undersigned recommends that the decision of the

Commissioner be affirmed.

## I.  PROCEDURAL HISTORY

On January 21, 2011, Plaintiff applied for SSI, alleging that she had been unable to work

since June 30, 2009 due to epilepsy. (Tr. 120-25, 140, 144). That application was initially denied.

(Tr. 69-72). On March 16, 2011, Plaintiff filed a Request for Hearing by Administrative Law

Judge (ALJ). (Tr. 75). After a hearing on March 8, 2012, the ALJ issued an unfavorable decision

on May 21, 2012. (Tr. 7-25). Plaintiff filed a Request for Review of Hearing Decision with the

Social Security Administration's Appeals Council on July 17, 2012 (Tr. 6), but the Appeals Council declined to review the case on July 10, 2013. (Tr. 1-5). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.    FACTUAL BACKGROUND

### A. PLAINTIFF'S TESTIMONY

Plaintiff testified before the ALJ at a hearing on March 8, 2012. (Tr. 27). Plaintiff was 24 years old at the time of the hearing. (Tr. 31). She has attended some college-level classes. (Tr. 44).

Plaintiff suffers from seizure disorder and bipolar disorder and takes medications for those conditions. (Tr. 33-35). Plaintiff's most recent seizure was in December 2010. (Tr. 34). She does not go shopping alone because she fears she might fall. (Tr. 37). She has sensitivity to light because it can induce seizures. Plaintiff has sensitivity to loud, sharp, and rhythmic noises. (Tr. 40). She cannot drive or be in a car at night because the headlights of cars heading in her direction drive her into a panic and make her feel like she is going to have a seizure. (Tr. 42). Plaintiff's bipolar disorder causes her to experience episodes of mania and episodes of suicidal ideations every day. (Tr. 36).

Plaintiff's medications cause side effects of extreme drowsiness, dizziness, memory problems, and difficulty with concentration. (Tr. 34, 39, 41). She sleeps 16 hours a day and lies down resting around two to four hours a day. (Tr. 35). She experiences dizziness two to eight times a day and migraines three to five times a week. (Tr. 35, 37-38). Her dizziness makes it difficult for her to use a computer. (Tr. 40-41).

At the time of the hearing, Plaintiff was working three to six hours a week at the Juvenile Office, working with students on homework and home problems. (Tr. 31). She had problems completing her work because of the bad lighting in the school, the difficulty in finding a place to work with her students, and the stress of the position. (Tr. 32). She had to reschedule her work days every couple weeks because of side effects from her medication. (Tr. 33). Prior to working at the Juvenile Office, Plaintiff worked as a teacher's aide at a daycare for a maximum of 15 hours a week for eight months. (Tr. 31-32). She often worked less or left early because of dizziness, difficulty with the noise and temperature of the workplace, and a desire not to have a seizure in front of the children. (Tr. 32-33).

### B.  MEDICAL RECORDS

Records from 2005 through 2007 show that Plaintiff went to the hospital on multiple occasions with reports of seizures or possible seizures. (Tr. 296, 303, 329, 331, 346, 353-54, 360, 366-67). During this period, CT scans and MRI scans were generally normal. (Tr. 301, 309, 315-16, 341, 364-65). Some of her seizures were apparently related to illegal drug use and some were apparently related to noncompliance with her medications or reductions in the dosage of her medications. (Tr. 296-300, 335). She was sometimes restricted from driving due to her seizures. (Tr. 375-76). During this time, Plaintiff also experienced episodes of suicidal ideation, anxiety, depression, and mood swings, one of which led to a five-day hospitalization in October 2007. (Tr. 318-19, 327, 377, 380). Plaintiff was treated with various medications for her seizures and her mental impairments during this time, including Tegretol, Lamictal, Clonazepam, Risperdal, and Buspirone. (Tr. 343, 346, 363, 375-77).

In February and March 2008, Plaintiff was treated by psychiatrist Dr. Bun Tee Co. He noted that she was fairly stable, her mood was calm, and she was going to school five days a week.[1] Her medications were noted to include Risperdal, Klonopin, and Tegretol. (Tr. 254).

On March 5, 2008, Plaintiff visited Dr. Julia Zavallos and reported having had a seizure on February 8, 2008. She had taken some Xanax that she got on the street, and when she stopped it, she had a seizure. Plaintiff requested clearance to drive, but Dr. Zavallos explained that she had to be seizure-free for six months to be allowed to drive. (Tr. 347).

Also on March 5, 2008, Plaintiff visited Dr. Kenneth Kilian, M.D. Dr. Kilian noted that Plaintiff was fighting with her family and experiencing anxiety, depression, and stress. He refused Plaintiff's request for driving clearance and encouraged her to remain off marijuana and to get further psychiatric evaluation and treatment. (Tr. 272).

On August 23, 2008, Plaintiff told Dr. Co that she felt "out of control" and stated that Risperdal helped her from "going out of her mind." He adjusted her medications. (Tr. 255).

On September 25, 2008, Plaintiff visited Dr. James Edward Alonso, a neurologist, for follow-up regarding her epilepsy. (Tr. 227). Dr. Alonso noted that Plaintiff had no complaints, had been doing very well, had been stable, was tolerating her Tegretol, had not had any seizures since February 2008, and was maintaining good compliance. (Tr. 261). Dr. Alonso diagnosed "seizure disorder—clinically stable" and reinstated her driving privileges. (Tr. 227-28).

On October 18, 2008, Plaintiff saw Dr. Co, who noted that she was calm and not irritable. (Tr. 256).

On October 30, 2008, Plaintiff visited Dr. Kilian and complained of feeling "horrible." Plaintiff reported having suicidal thoughts, trouble with her memory, headaches, decreased

---

[1] Dr. Co's notes throughout the record are largely illegible.

motivation, anger, and depression. She reported smoking marijuana at times. She was assessed as having seizure disorder, bipolar affective disorder, and anxiety syndrome, and her medications were adjusted. (Tr. 269).

On December 20, 2008, Dr. Co noted that Plaintiff's mood was calm. (Tr. 256).

On January 19, 2009, Plaintiff visited Dr. Kilian and complained of not feeling well emotionally and feeling sick to her stomach because of her nerves. Plaintiff had no headache pain or depression but reported increased anxiety. She was assessed as having gastritis, seizure disorder, migraines, bipolar disorder, depression, and anxiety. (Tr. 267).

On February 21, 2009, Dr. Co noted Plaintiff's mood was calm, though she stated that she had been anxious. (Tr. 257).

On March 14, 2009, Dr. Co noted that Plaintiff felt depressed and anxious because she was not allowed to use pot. (Tr. 257).

On March 16, 2009, Plaintiff's father brought her to the emergency department because she had been talking about killing herself. (Tr. 390). She was very angry and agitated. (Tr. 391). She was diagnosed with bipolar disorder and suicidality but was told that because she was pregnant, she would not be able to be admitted. (Tr. 392).

On April 9, 2009, Plaintiff saw Dr. Alonso. She was noted to be "doing fairly well." She had not had any seizures since December 2008 and was tolerating her medications well. (Tr. 226).

On June 24, 2009, Dr. James Spence completed a Psychiatric Review Technique and found that Plaintiff had no severe impairments. (Tr. 278, 286).

Plaintiff saw her psychiatrist, Dr. Co, on approximately six occasions between December 2009 and October 2010. In December 2009, he noted that Plaintiff's mood was calm and she was

not suicidal or homicidal. In March 16, 2010, he noted that she was less dysphoric. (Tr. 236). In May 2010, she reported feeling stressed out and feeling very anxious in public places. In June 19, 2010, she reported feeling somewhat anxious and irritable and stated that she was experiencing a lot of anger. (Tr. 235). In August 2010, Dr. Co noted that Plaintiff's mood was calm and she was coping more adequately. In October 2010, he noted that her mood was somewhat apprehensive. (Tr. 234).

On October 29, 2010, Plaintiff presented at the emergency department, reporting that she had had a seizure. (Tr. 396). Her Tegretol dosage was increased, and she was told not to drive for six months and to avoid activities such as swimming. (Tr. 399).

On November 2, 2010, Plaintiff visited Dr. Alonso's office and reported that she had been experiencing dizziness, sleepiness, and double vision since she increased the dosage of her medications. Dr. Alonso noted that the night before Plaintiff's recent seizure, she had been stressed, had not slept well, and had not eaten anything. Dr. Alonso decreased her Tegretol dosage. (Tr. 404).

On November 9, 2010, an EEG was abnormal "due to generalized sharply contoured slowing suggestive of cortical irritability." (Tr. 402).

On December 4, 2010, Dr. Co noted that Plaintiff was fairly calm and not irritable. (Tr. 425).

On February 18, 2011, Plaintiff presented to Dr. Kilian for evaluation and management of her anxiety, migraines, and gastrointestinal issues. She denied feeling anxious, depressed, or stressed. She also denied memory concerns. Dr. Kilian noted that she had been started on Vimpat for her seizures and could not remember when her last seizure was. (Tr. 415).

On February 19, 2011, Plaintiff visited Dr. Co, and he continued her medications. (Tr. 425).

On February 25, 2011, Dr. James Morgan, Ph.D., completed a Psychiatric Review Technique form. (Tr. 237-47). He found Plaintiff had a medically determinable impairment of depression and had moderate restriction of activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; no limitations in maintaining social functioning; and no repeated episodes of decompensation of extended duration. (Tr. 240, 245). On the same day, Dr. Morgan completed a Mental Residual Functional Capacity Assessment. (Tr. 248-50). He found Plaintiff moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and the ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 248-49). He found no significant limitations in the other areas assessed. (Tr. 248-49). He concluded that Plaintiff was capable of performing at least simple, repetitive tasks on a sustained basis. (Tr. 250).

On March 8, 2011, Plaintiff underwent an EEG, which was abnormal "due to slowing in a generalized fashion, more prominent in the left temporal lobe suspicious for seizure disorder emanating from the area." (Tr. 403).

On April 9, 2011, Dr. Co noted that Plaintiff's mood was calm, that she was appropriately dressed and groomed, that she was relevant and coherent, and that she had logical and sequential thought processes. (Tr. 426).

On May 3, 2011, Plaintiff returned to Dr. Alonso and reported having had about three seizures in March, but she noted that she had not yet started Vimpat and had been without medication for a short time. She stated that she had not had any seizures since she started taking Vimpat. Dr. Alonso indicated that her memory issues were side effects of her seizure disorder and might one day resolve with control of her seizures. She was diagnosed with "seizure disorder, stable with medication, only seizures noted when missing dose." (Tr. 407).

On June 11, 2011, Dr. Co noted that Plaintiff's mood was calm, that she was appropriately dressed and groomed, that she was relevant and coherent, and that she had logical and sequential thought processes. (Tr. 426).

On August 13 and October 15, 2011, Plaintiff saw Dr. Co. He found her mood to be stable and calm but noted that she had talked about increased anxiety. (Tr. 427).

On November 3, 2011, Plaintiff visited Dr. Alonso and reported having had no seizures since November 2010. She reported feeling pretty good and feeling better since being placed on Vimpat. She was tolerating the Vimpat well without noted side effects. (Tr. 408).

On December 17, 2011, Dr. Co noted that Plaintiff had some family stresses and continued her Tegretol, Klonopin, and Seroquel. (Tr. 428).

On February 18, 2012, Dr. Bun Tee Co noted that Plaintiff's mood was calm, and he continued her medications. (Tr. 428).

On March 1, 2012, Maureen Bench, R.N., and Dr. Alonso completed a physician statement. (Tr. 423-24). They indicated that Plaintiff had complex partial seizures and generalized seizures; had convulsive seizures about once a year; had good compliance with treatment; and had memory disturbances as a side effect of medications. (Tr. 423).

On April 11, 2012, at the request of the Social Security Administration, Dr. James Reid, Ph.D., reviewed Plaintiff's medical records and completed a medical source statement. (Tr. 449-52). Dr. Reid found that Plaintiff had moderate limitations in the ability to understand, remember, and carry out complex instruction and to make judgments on complex work-related decisions. (Tr. 449). He found that she had only mild limitations in the ability to understand, remember, and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; and respond appropriately to usual work situations and changes in routine work setting. He also noted that Plaintiff needed a substance treatment program. (Tr. 451). Dr. Reid also opined that Plaintiff had moderate difficulties in maintaining social functioning, mild restriction in activities of daily living, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 458). He stated that she retained at least the capacity for simple, routine, and repetitive tasks. (Tr. 461).

## C. VOCATIONAL EVIDENCE

The Vocational Expert ("VE") testified at the hearing before the ALJ that Plaintiff's past work included work as a laundry attendant, sandwich maker, daycare worker, and case aide. (Tr. 49-50). The ALJ described the following hypothetical individual to the VE:

> [Assume] a hypothetical worker able to lift and carry 20 pounds occasionally, 10 pounds frequently; who could stand and/or walk at least two hours total in an eight-hour workday, sit for about six hours in an eight hour workday, both of those assuming the normal breaks; the worker would need to avoid exposure to hazards such as unprotected heights, dangerous machinery, needing to balance, should not climb ladders, scaffolds, or similar items, or crawl; the worker could occasionally stoop, kneel, or crouch; occasionally operate motorized vehicles in a work setting let's say in the daytime; should avoid exposure to extreme heat or cold; and limited to, say, office level noise in the work setting.

(Tr. 50-51). The VE testified that such an individual could perform work as an information clerk, a call out operator, or a charge account clerk. (Tr. 51-52). The ALJ added to the hypothetical the

factor of the worker only being able to tolerate occasional contact with others on the job. The VE testified that the above jobs required more than occasional contact but that the hypothetical person could be a sticker (*DOT* code 734.687-090; 239,550 jobs nationally and 5,990 in Missouri); an egg processor (*DOT* code 559.687-034; 139,000 jobs nationally and 560 in Missouri); or an eyeglass frames polisher (*DOT* code 713.684-038; 81,740 jobs nationally and 1,110 in Missouri). (Tr. 52). The VE testified that if the worker also needed to lie down for a rest break after four hours of activity with a rest break lasting more than 15 minutes, the person could lie down during her lunch break. The VE testified that if the worker also needed the opportunity to sit or stand at-will, no jobs would be available. (Tr. 53).

The VE testified that if the ALJ's first hypothetical individual needed to take occasional unscheduled interruptions during the workday, she would not be able to work competitively. (Tr. 54). The VE testified that if the ALJ's first hypothetical individual needed to miss one day a month on an ongoing basis, it would be very difficult to maintain employment unless she accrued leave as part of her job. (Tr. 55).

### III.     STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a plaintiff must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e). At Step Four, the Commissioner determines whether the claimant can

return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV. DECISION OF THE ALJ

Applying the foregoing five step analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 10, 2011, the application date; had severe impairments of seizure disorder and depression; and did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR § 404, Subpart P, Appendix 1. (Tr. 12). The ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 CFR § 416.967(a) except that claimant can lift 20 pounds occasionally and 10 pounds frequently; sit for about six hours in a workday with normal breaks; avoid exposure to unprotected heights, dangerous machinery, and extreme heat or cold; not climb ladders or scaffolds or do work that requires balancing; occasionally stoop, kneel, and

crouch; only drive in daytime and only work in an environment with only office-level noise; and perform simple work with occasional contact with others. (Tr. 13-14). The ALJ found that Plaintiff had no past relevant work. Relying on the testimony of the VE, the ALJ found there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform, including the jobs of sticker, egg processor, and eyeglass frames polisher. (Tr. 18). The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since January 10, 2011, the date the application was filed. (Tr. 19).

## V.　　DISCUSSION

In appealing the ALJ's decision, Plaintiff contends the ALJ's decision should be reversed because: (1) the ALJ made several errors in determining Plaintiff's residual functional capacity, including failing to ensure that it was supported by "some" medical evidence; (2) the ALJ erred in his consideration of Plaintiff's subjective complaints; and (3) the ALJ's conclusion at Step Five was not supported by substantial evidence because it was based on the Vocational Expert's response to a flawed hypothetical question.

### A. STANDARD FOR JUDICIAL REVIEW

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that

decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B. THE RFC ASSESSMENT

Plaintiff's principal challenge to the RFC assessment is that the ALJ failed to point to "some" medical evidence to support his conclusions regarding Plaintiff's RFC. In conjunction with this argument, Plaintiff also appears to argue that the ALJ erred by not basing the RFC on any one medical opinion and by failing to properly consider Dr. Reid's opinion that Plaintiff needed substance abuse treatment. The undersigned will address each of these contentions.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Thus, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the

claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" *Id.* at 712 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

The RFC assessment in this case is supported by substantial evidence and by "some" medical evidence, including opinion evidence and medical treatment notes. With regard to Plaintiff's mental functioning, the ALJ found that Plaintiff was capable of performing simple work involving only occasional contact with others. As the ALJ explained, that finding is supported by the February 2011 mental RFC assessment of state agency consultant Dr. Morgan, who opined that Plaintiff was capable of performing at least simple, repetitive tasks on a sustained basis, though she would have moderate limitations in her ability to perform complex tasks and complete a normal workday without interruptions from psychologically based symptoms. (Tr. 16-17, 250). It was also supported by the post-hearing opinions of nonexamining psychologist Dr. Reid, who stated that Plaintiff "retains, at least, the capacity for simple, routine, and repetitive tasks" and had only mild limitations in her ability to interact with others. (Tr. 17, 449-52, 461). The foregoing opinions are not inconsistent with the treatment notes of Plaintiff's treating psychiatrist, Dr. Co. (Tr. 16-17). Although Dr. Co noted at times that Plaintiff had anxiety, anger, irritability, or an apprehensive mood (Tr. 234-35, 257, 427), his findings were generally mild or normal and showed that Plaintiff was "calm," was not irritable, had relevant and coherent thought processes, and had appropriate dress and grooming. (Tr. 233-34, 236, 257, 425-27). In addition, Plaintiff's primary care physician stated in February 2011 that Plaintiff denied feeling anxious, depressed, or stressed and denied memory concerns. (Tr.16-17, 415).

The ALJ's physical RFC determination that Plaintiff could perform a range of sedentary work with some additional limitations, including avoiding exposure to unprotected heights and

dangerous machinery, was also supported by substantial evidence, including medical evidence. The ALJ properly considered the opinion completed jointly by Maureen Bench, R.N., and Plaintiff's treating neurologist, Dr. Alonso, stating that Plaintiff had approximately one convulsive seizure a year. (Tr. 16). The ALJ found that this opinion did not support an RFC more limiting than the one he assessed, because his RFC already incorporated significant functional limitations accommodating potential problems related to the plaintiff's seizure disorder, including limitations on Plaintiff's ability to be exposed to unprotected heights and dangerous machinery. (Tr. 13, 16). The physical RFC is also supported by medical evidence showing that Plaintiff's seizures occur mostly when she is noncompliant with medication: on May 3, 2011, Dr. Alonso stated that Plaintiff's seizure disorder was "stable with medication, only seizures noted when missing dose." (Tr. 407). Medical conditions that are controllable with medication cannot be considered disabling. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067-68 (8th Cir. 2012) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (quotation marks omitted). The finding that Plaintiff could perform a range of sedentary work is also supported by the numerous treatment notes indicating that Plaintiff's extremities were normal and that she had a normal gait. (Tr. 225-26, 228, 260, 265, 267, 271, 322, 333, 344, 348, 350, 397, 407-09, 412-14, 416).

Plaintiff also argues that the RFC is not supported by substantial evidence because "the findings of residual functional capacity are not supported by any one medical opinion." (Pl's. Br. at 12). Contrary to Plaintiff's contention, the ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians" in determining a claimant's RFC. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quotation marks omitted); *Martinez v. Colvin*, No. 12–3042–CV–S–ODS–SSA, 2013 WL 1945703, at *5

(W.D. Mo. May 10, 2013 (rejecting the plaintiff's argument that because the ALJ gave little weight to the opinions of Plaintiff's physicians, the RFC assessment was necessarily the product of unsupported speculation). Instead, "[i]t is the ALJ's responsibility to determine [claimant's] RFC based on all the relevant evidence." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation marks omitted). Here, although the RFC did not mirror any of the particular opinions in the record, the ALJ determined Plaintiff's RFC based on all of the relevant evidence in the record, including opinion evidence, medical treatment records, and the ALJ's evaluation of Plaintiff's subjective complaints.

Plaintiff further argues that the ALJ erred in his assessment of Dr. Reid's opinion. Plaintiff notes that Dr. Reid opined that Plaintiff needed a substance treatment program, and she argues that the ALJ failed to consider this opinion in light of the standards outlined in *Brueggemann v. Barnhart,* 348 F.3d 689 (8th Cir. 2003). This argument is without merit. In *Brueggemann*, the Eighth Circuit held that where substance abuse is an issue, the ALJ must first "determine whether [the claimant] is disabled" using the standard five-step approach, "without deductions for the assumed effects of substance disorders." *Id.* at 694 (citing 20 C.F.R. § 404.1535(a)). Then, if the ALJ determines that all of a claimant's limitations, including the effects of substance use disorders, show that the claimant is disabled, then the ALJ "must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95 (citing *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 404.1535(b)(2)). Here, after conducting the proper five-step analysis (during which he gave "significant weight" to the limitations assessed by Dr. Reid), the ALJ found Plaintiff was *not* disabled. (Tr. 17). There is no indication in the record that, in reaching this decision, the ALJ improperly deducted the assumed effects of Plaintiff's substance abuse. Because the ALJ found

that Plaintiff was not disabled, even with the any limitations that might be caused by her drug use, it was unnecessary for him to follow *Brueggemann*'s second step and assess whether drug use was a contributing factor material to the determination of disability. *See* 20 C.F.R. § 416.935(a) ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.") (emphasis added).

In sum, the ALJ properly considered the relevant evidence, and the RFC assessment was supported by substantial evidence, including some medical evidence. The ALJ's assessment of Plaintiff's RFC fell within the zone of available choice, and the court should not disturb the ALJ's decision merely because it might have reached a different conclusion had it been the finder of fact in the first instance. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

## C. THE ALJ'S ASSESSMENT OF PLAINTIFF'S SUBJECTIVE COMPLAINTS

Plaintiff next argues that the ALJ improperly gave weight to Plaintiff's daily activities and her part-time work in assessing the credibility of her subjective complaints. The undersigned disagrees.

When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reasons for

discrediting the complaints.'" *Moore*, 572 F.3d at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

The ALJ here made an express credibility determination based on several of the above factors, including Plaintiff's ability to perform daily activities such as meal preparation, housework, pet care, going to church, personal care, socializing with her boyfriend, and getting along with friends and authority figures; Plaintiff's ability to perform part-time work during the alleged disability period; the medical evidence suggesting that Plaintiff's seizure disorder was controlled when she was compliant with medication; the fact that Plaintiff did not consistently report to her doctors the side effects of medication she complained of in her testimony; and Plaintiff's poor work history prior to the disability period, which might indicate a lack of motivation to work rather than a lack of ability. (Tr. 17-18).

Plaintiff argues that it was improper for the ALJ to consider her daily activities, because activities such as light housework and pet care do not establish an ability to perform competitive work. The Eighth Circuit has recognized that its cases "send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain." *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009); *compare, e.g.*, *Medhaug v. Astrue*, 578 F.3d 805, 875 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain.") *with Reed v. Barnhart*, 399 F.3d 917, 923-24 (8th Cir. 2005) ("[T]his court has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.") (quotation marks omitted). However, Eighth Circuit cases generally suggest that it is proper for the ALJ to

consider such daily activities in conjunction with other factors affecting the credibility of a Plaintiff's complaints. *See*, *e.g., Halverson v. Astrue*, 600 F.3d 922, 932-33 (8th Cir. 2010) (holding that the ALJ properly considered daily activities in conjunction with other inconsistencies in the record in assessing the credibility of Plaintiff's complaints); *Wagner v. Astrue*, 499 F.3d 842, 852-53 (8th Cir. 2007) (finding a claimant's accounts of "extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends" supported the ALJ's conclusion that his complaints were not fully credible). Here, it was not unreasonable for the ALJ to consider Plaintiff's ability to participate in various daily activities along with other relevant factors in assessing the credibility of her allegations of disabling mental and physical conditions.

Second, Plaintiff argues that it was improper for the ALJ to consider Plaintiff's part-time work during the alleged disability period. A claimant's ability to perform part-time work may be considered as part of the credibility analysis. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that [the plaintiff's] daily activities, including part-time work . . . were inconsistent with her claim of disabling pain."). *See also* 20 C.F.R. § 416.971 ("Work that a claimant "[has] done during any period in which [she] believe[s] [she is] disabled may show that [she is] able to work at the substantial gainful activity level."). Plaintiff's ability to work several hours a week with students on homework and home problems (Tr. 31) is certainly relevant to a consideration of her mental and physical abilities to perform work.

In sum, the ALJ conducted a proper credibility analysis, and the court should defer to the ALJ's credibility determination. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

### D. The ALJ's Step Five Finding

At Step Five, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including sticker, egg processor, and eyeglass frames polisher. (Tr. 18-19). In making this finding, the ALJ relied on the testimony of a Vocational Expert about what jobs could be performed by several hypothetical individuals with various combinations of impairments. (Tr. 19). Plaintiff argues that the Step Five finding was not supported by substantial evidence because (1) the hypothetical considered by the Vocational Expert and relied on by the ALJ was based on a flawed RFC finding, and (2) the hypothetical considered by the Vocational Expert and relied on by the ALJ did not include the limitation, present in the RFC, that Plaintiff could perform only "simple" work.

Because the undersigned has found that the RFC was supported by substantial evidence, the first argument is without merit. With regard to the second argument, Plaintiff is correct that the hypotheticals considered by the Vocational Expert did not include the RFC's "simple work" limitation. (Tr. 50-53). However, this error was harmless. Among the jobs identified by the Vocational Expert was the job of sticker (*DOT* code 734.687-090). (Tr. 19, 50-57). "Each occupation in the DOT is coded with a reasoning development level, which corresponds to the ability to follow instructions and solve problems that is required for satisfactory job performance." *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010). The sticker job has a reasoning level of one, which requires a person to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *DOT* code 734.687-090, 1991 WL 679968. The Eighth Circuit has stated that "[o]ccupations with a reasoning development level of one necessarily involve only simple instructions." *Hulsey*, 622 F.3d at 923. Thus, the

sticker job is consistent with the limitation to simple work. In addition, the number of sticker jobs identified (5,900 in Missouri) is well above the numbers of jobs previously found to be "significant" by the Eighth Circuit. *See Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997) (340 jobs in the state was considered significant); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs in region considered significant). Because the sticker job is consistent with a limitation to simple work and is present in significant numbers, the ALJ's failure to include that limitation in the hypothetical considered by the vocational expert was harmless. *See England v. Astrue,* 490 F.3d 1017, 1023-24 (8th Cir. 2007) (ALJ's failure to include a limitation in hypothetical to Vocational Expert was harmless where evidence showed that Plaintiff could perform jobs identified even with the omitted limitation); *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (applying harmless error analysis and noting that the standard is "whether the ALJ would have reached the same decision denying benefits" even absent the error).

## VI.   CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of August, 2014.